```
                    UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF IOWA
                           WESTERN DIVISION


IN RE:

BRUCE E. WORREL                                       Chapter 7
TAMRE L. WORREL

     Debtors.                             Bankruptcy No. 07-01245F
```

### DECISION RE: U.S. TRUSTEE'S MOTION TO DISMISS

United States trustee Habbo G. Fokkena moves to dismiss debtors' chapter 7 case on the ground that granting relief would be an abuse of the provisions of chapter 7.  Hearing on the motion was held on October 31, 2007.  By consent of the parties, the hearing took place in Des Moines, Iowa.  John F. Schmillen appeared for the United States trustee; Michael P. Mallaney appeared for debtors Bruce E. and Tamre L. Worrel.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

Worrels filed their joint petition in the Bankruptcy Court for the Southern District of Iowa on June 14, 2007.  On July 5, 2007, Fokkena filed a motion alleging that venue in the Southern District was improper, and he asked for transfer of the case to the Northern District of Iowa.  Worrels filed a consent to the change, and on July 11, 2007, the court transferred the case to this district.  Fokkena timely filed his motion to dismiss on September 20, 2007.  Fed.R.Bankr.P. 1017(e)(1) (interim rule).

For the reasons stated hereafter, I conclude that granting relief would be an abuse of the provisions of chapter 7.  The

court will enter an order dismissing Worrels' chapter 7 case.

Bruce Worrel[1] is 60 years old.  Tamre is 47.  Worrels are individual debtors whose debts are primarily consumer debts.  They reside at 22628 Circle Drive, Fort Dodge.  They live in the countryside just southwest of the Fort Dodge city limits.  Their home is two blocks from a "regular blacktop" road and two to three miles from U.S. highway 169.

Bruce was formally educated through the 12th grade.  He was employed for 26 years as a custodian for the Fort Dodge school district.  He had both knees replaced in October 2002.  Upon the advice of his physician, he retired from employment with the school district.  He applied for and was granted social security disability status.  He receives $1,401.00 in monthly disability payments.  He also receives $953.00 per month in benefits from the Iowa Public Employees Retirement System.  Bruce has been employed part-time for approximately the past three years by Sun Market & Deli, which operates two convenience/gas station stores in Fort Dodge.  For the six months prior to filing, Bruce's gross "current monthly income" from the employment averaged $701.68.  See 11 U.S.C. § 101(10A) (exhibit 6).  In June, he estimated his gross monthly income from this job, at the time of filing bankruptcy, as $899.17.  He intentionally limits his hours with

---

[1] Hereinafter each debtor will be referred to by his or her first name.

the employer so as not to interfere with earning limits on his disability status.  At filing, Bruce estimated his monthly take-home pay from all sources as $2,700.36 (exhibit 4, schedule I).

Bruce works from 2:00 a.m. to between 9:00 and 10:00 a.m. five to seven days a weeks.  His responsibilities include ensuring that each store's safe contains sufficient money for the day's operations, balancing the lottery ticket sales and "house charges," ordering gasoline, and making bank deposits.  Bruce took the job for the extra income and to "get out of the house."  Worrels' home is located about three miles from one of the convenience stores and about five miles from the other.

Over the years, Bruce has suffered from various injuries and illnesses.  However, at present, his only health problem is with his knees.

In March 2007, he slipped on ice and fell, hitting his head on pavement.  The trauma caused internal cranial bleeding.  To stop the bleeding, he underwent surgery three times on the day of the fall.  He missed 12 weeks of work with his part-time employer.  He has recovered and has had no further problems from the injury.

Tamre has worked for the past ten and one-half years at Fort Dodge Animal Health.  It is located at 800 - 5th Street NW in Fort Dodge, nearly seven miles from Worrels' home.  She is a production worker, packaging and labeling animal medicines.  She

works four ten-hour shifts per week.  Her hours are from 4:00 p.m. to 2:30 a.m.  For her 40-hour work week she receives $18.39 per hour.  She earns gross pay of approximately $3,187.60 per month, not including overtime pay.  She says she receives overtime only occasionally.  After deductions for taxes, insurance, union dues, a United Way contribution, a savings bond deduction, and a pre-tax medical account contribution, her take-home pay is approximately $2,107.95 per month (exhibit 4, schedule I).

Tamre's annualized gross income as taken from her schedule I would be $38,251 (exhibit 4).  On the Statement of Affairs, she showed her 2006 gross wages as $46,275.00 (exhibit 4, p. 25). She testified that she receives overtime only occasionally.  She was not able to explain the discrepancy.

Tamre has no current health problems.  She had gastric bypass surgery in April 2004.  Bruce has also had gastric bypass surgery.  As a result, both must take a medically prescribed protein supplement.

At the time of filing bankruptcy, Worrels estimated their combined monthly income, after all deductions at $4,808.31 (exhibit 4, p. 23, schedule I).  Also at the time of filing, Worrels scheduled the following monthly expenditures:

        home mortgage                      $   946.00
        electric and heating fuel      308.00
        water and sewer                   68.00
        telephone                               82.00

|  |  |
|---|---|
| cell phone | 98.00 |
| home maintenance | 200.00 |
| food | 320.00 |
| clothing | 75.00 |
| medical and dental expense | 180.00 |
| transportation | 420.00 |
| recreation | 200.00 |
| charitable contributions | 25.00 |
| auto insurance | 81.00 |
| Suburban lease payment | 1,192.00 |
| Trailblazer lease payment | 649.15 |
| protein supplement | 300.00 |
| Total expenses | $5,144.15 |

Worrels' schedules I and J together showed negative monthly net income ($4,808.31 - $5,144.15) in the amount of $335.84 (exhibit 4, p. 24). They received a federal tax refund of $1,579.00 for the 2006 tax year and a state tax refund of $1,120.00 for 2006 (exhibit 8). These refunds are not accounted for in Worrels' schedules I and J net income estimate.

Prior to March 20, 2007, Worrels owned two motor vehicles--a 1994 Jeep Cherokee and a 2005 Chevrolet Tahoe. There was no debt against the 1994 Jeep Cherokee. The Tahoe had been purchased from Karl Chevrolet in Ankeny on August 15, 2005 (exhibit A).

On March 20, 2007, Worrels entered into a GMAC SmartLease Agreement with Karl Chevrolet (exhibit 2). They leased a new 2007 Chevrolet Suburban 4-door, 4-wheel drive motor vehicle for a period of four years. They traded in the Tahoe. The balance owed at the time on the Tahoe was $42,091.13. Worrels received a trade-in allowance of $28,167.00 leaving a negative trade-in balance of $13,924.13, which became part of the lease obligation

5

on the 2007 Suburban.

The lease required Worrels to make monthly payments of $1,192.03 for 48 months beginning March 30, 2007 (exhibit 2). Bruce said he purchased the vehicle because the Tahoe got "lousy gas mileage"--13 miles per gallon on the highway and eight to nine miles per gallon in town. The new Suburban was expected to get better mileage. He said it gets 19 miles per gallon on the highway and 16 miles per gallon in town. Also Worrels wanted a larger vehicle than the Tahoe to facilitate their hobby. Worrels have two purebred German Shepherds which they show. The Suburban better accommodates the necessary crates and equipment. The last time they showed the dogs was about two weeks ago in Denver, Colorado.

Bruce testified that they also need to lease a 4-wheel drive vehicle because they live in the country, and the roads in winter are not always plowed by the time they must go to work.

After injuring his head and missing work for 12 weeks in March 2007, he and Tamre began falling behind on their credit card payments. Worrels began receiving collection calls from the credit card companies. They attended credit counseling on April 24, 2007 in Des Moines (exhibit 3). Bruce testified that the counselor told them that the counseling agency could not help them; the counselor suggested bankruptcy.

Worrels contacted a bankruptcy attorney. On May 23, 2007

they signed their petition and schedules.  However they did not file immediately.

On June 2, 2007, Worrels entered into a second new car lease with Karl Chevrolet (exhibit 5).  The lease was for a new 2007 Chevrolet Trailblazer, 4-wheel drive, sports utility vehicle. The lease required 48 monthly payments of $649.15 beginning June 2, 2007.

Worrels said the purchase was necessary because their 1994 Jeep Cherokee was not in good condition.  By the spring, it had approximately 244,000 miles on it.  There were problems with the transmission and the rear end differential.  In the spring of this year Bruce believed it would cost $3,000.00 to fix the vehicle.  He did not get a formal estimate until the time of the hearing.  The estimate shows a repair cost of $4,737.14 (exhibit B).  Worrels decided to lease another 4-wheel drive vehicle.

They made no effort to shop around for the purchase of either new or used vehicles.  They knew they could lease from Karl Chevrolet without a problem.  Bruce said he assumed that no dealer would sell to them because of their credit problems and because they had no down payments.  They chose which vehicles to lease because they wanted 4-wheel drive vehicles and because the Suburban would better hold the dog equipment and crates.  Bruce testified that the 1994 Jeep is no longer driveable; it is sitting in the driveway at their home.

After executing the lease on June 2, Worrels filed their chapter 7 petition on June 14, 2007.  On June 25, 2007 they filed bankruptcy form B22A, regarding means testing (see 11 U.S.C. § 707(b)(2)).  The form showed $5,391.29 in combined "current monthly income" (exhibit 7).  This amount was not required to include Bruce's social security disability payments.

The form showed deductions from income of $5,744.31 leaving monthly disposable income under § 707(b)(2) of negative $353.02 (id.).  The deductions included "average monthly payments" on the new vehicles of $766.67 for the Suburban and $821.67 for the Trailblazer.  These payments totaled $1,588.34 (id., p. 5, section 42).  The average payments under the means test would likely be different from the actual monthly lease payments under the leases because the total payments over the four-year leases would be averaged over 60 months under the means test.  The court, however, cannot replicate the Worrels' calculation.  The IRS standards for vehicle ownership for the first owned car is $471.00 and for the second car it is $332.00 (exhibit 7, p. 3, sections 22-23).

The United States trustee has moved to dismiss pursuant to 11 U.S.C. § 707(b)(1) and (3).  Those sections provide that the court may dismiss a chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if it finds that granting relief would be an abuse of the provisions of chapter 7.

11 U.S.C. § 707(b)(1).  Subsection 707(b)(3) states in pertinent part that

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(1) of such paragraph does not arise or is rebutted, the court shall consider--
>
>     (A) whether the debtor filed the petition in bad faith; or
>
>     (B) the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The U.S. trustee contends that although the presumption of abuse does not arise under 11 U.S.C. § 707(b)(2)(A)(i), the court should consider that under the totality of the circumstances of debtors' financial situation, granting relief would be an abuse of the provisions of chapter 7.

I do find that based on the totality of the circumstances, granting relief would be an abuse.  I base the finding on the debtors' leasing of two expensive new 2007 sports utility vehicles shortly before filing their bankruptcy petition--one within 12 days of filing and the other within 90 days of filing.

The monthly payments on these two vehicles total $1,841.18 for four years.  This is more than $1,000.00 per month in excess of the IRS allowance for ownership of two vehicles over a 60-month period.  The monthly payments are 38 per cent of Worrels' combined monthly net income.

Worrels assumed that they could not purchase a car with their credit history, but Bruce knew they could lease from Karl. Bruce testified further that the main considerations were the gas mileage improvement over the Tahoe, 4-wheel drive capability, and the size of the Suburban to accommodate their show-dog hobby. They provided no testimony that they looked at any less expensive 4-wheel drive vehicles.

Had they investigated they likely may have found 4-wheel drive vehicles within the ownership expense guidelines of the IRS. The IRS allowances for two vehicles total $803.00. Had Worrels used these amounts as a limit on vehicle ownership as well as other IRS allowances, their monthly disposable income under form B22A would have been $432.32 per month. Over 60 months, this would have provided more than $20,000.00 for distribution to unsecured creditors, after deducting the standing trustee's fee and some additional allowance for debtors' attorney fees. This does not include consideration of Bruce's disability income.

Bruce's desire to have a job to get him out of the house did not produce any additional income. He drives the Suburban. The monthly cost for leasing it is $1,192.03. This does not include the cost of gasoline. The lease enables Bruce to hold a part-time job that provides at best $899.17 in gross income per month. It is doubtful it will increase much. Bruce limits his income

from the part-time job in order not to interfere with the amount of his disability payments.  Thus, for the purpose of giving Bruce something to do and in order to transport the couple's show dogs, Worrels avoid paying anything to their unsecured creditors. I find that this is in bad faith.  The cost of the leases was neither reasonable nor necessary.

The lease of the Suburban did not exacerbate an insolvable financial situation.  I infer from the timing of the transactions, that the two leases were entered into with a future intent to file bankruptcy.  These debtors had the income resources to pay some distribution to their unsecured creditors in a chapter 13 case.  Instead, on the eve of bankruptcy they leased two expensive vehicles for lease-payment amounts that bore no fair relationship to debtors' income.  I find their conduct in entering into the leases to be outrageous.

I conclude that this case should be dismissed under 11 U.S.C. §§ 707(b)(1) and (b)(3).

IT IS ORDERED that the chapter 7 case of Bruce E. Worrel and Tamre L. Worrel is dismissed.  Judgment shall enter accordingly.

DATED AND ENTERED  November 9, 2007

William L. Edmonds, Chief Bankruptcy Judge

11